April 20, 2018



FILED

2018 APR 23 PM 2: 25

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

Honorable Judge Christopher S. Sontchi
U.S. Bankruptcy Court for the District of Delaware
824 Market Street North, 5th Floor
Wilmington, DE 19801

Office of the U.S. Trustee
Attn: Richard L. Schepacarter, Trial Attorney at Department of Justice
844 King Street, Suite 2207
Wilmington, DE 19801
Richard.schepacarter@usdoj.gov

Re:  **Case # 18-10814**- EV Energy Partners, L.P. (EVEP)

Dear Judge Sontchi and Mr. Schepacarter, Esq:

I have read Kirkland and Ellis LLP's letters (dated April 12th and April 16th, 2018) prepared by Mr. Brad Weiland submitted to the Court and posted on the prime clerk website. Rather than duplicating comments Mr. Weiland has in his letters, I will summarize the points that we specifically do not agree with and clarify others for the Court from our perspective. <u>However, your Honor, we currently do not have legal representation since we have not been appointed an equity committee so the comments herein are based on our understanding and interpretation of the facts we have been presented with to date</u>:

*The statement that there is "no basis for appointment of an equity committee because the Debtors are hopelessly insolvent and therefore EVEP's equity holders are not entitled to any recovery based on market value of Debtors assets and businesses".*

> From an accounting perspective, an insolvency event is when an entity becomes unable to pay its debts as they fall due or is otherwise presumed to be insolvent. In EVEP's case, how does Delaware law determine when a corporation is insolvent? It appears based on my reading, that Delaware law recognizes that a corporation is insolvent <u>if it fails either of two tests: the "balance sheet" test or the "cash flow" test and these are primarily developed in case law</u>, as opposed to statutorily defined as in federal bankruptcy law.
>> a. **Balance sheet test-** entity is <u>insolvent when it has liabilities in excess of a reasonable market value of assets held.</u> Application of the balance sheet test is not a simple accounting exercise as the debtor's balance sheet (historical GAAP) is only a starting point in which debtor's assets should be valued using appropriate valuation methodologies and liabilities are generally measured at face value so if liabilities exceed assets the entity is insolvent: if not, it is solvent.

Page | 1

b. **Cash flow test**-is not entirely clear (does the entity become cash flow insolvent only at the point when it actually defaults on a debt or is it insolvent at an earlier point when it becomes clear that an entity will not be able to pay its debt in the future).

Therefore, **we can all agree that the valuation is key to the value assigned in the balance sheet test above. The question is whether the value assigned is reasonable and supportable and whether independent valuation specialists were used to value this entity** for purposes of the **balance sheet test**. There appears to be controversy over valuations based on my readings, which clearly demonstrate to me how truly complex valuations in Chapter 11 are and in fact, various Court decisions relate specifically to this point.

My interpretation is that it is certainly not as clear-cut as Mr. Weiland leads us to believe in his letter **which is why all significant assumptions need to be vetted. That is precisely why we are asking that an equity committee be appointed and charged with obtaining a reputable large, independent valuation from a valuation firm specializing in the oil/gas industry in order to determine the Enterprise Value and then compare that value to what was submitted to the Court (by management, Debtors and its advisors) in order to justify their position**.

- Mr. Weiland cites the Breitburn litigation and Judge Bernstein finding that "GAAP recoverability test can obviously overestimate the actual market value of an asset". I did not read Breitburn's petition but I do agree that "the book value of an oil and gas asset is an accounting concept that does not reflect the current market value". However, Breitburn was filed over two years ago in a commodity environment that was significantly lower than today's commodity environment; now, the GAAP recoverability test would actually be less than actual market value of an asset as we are in a rising commodity environment.
- Mr. Weiland also goes on to explain that "the debtors senior notes were trading at a significant discount which implies a shortfall to equity recovery" ; however, liquidity of the bonds also needs to be considered as to whether there really is an active market in the bonds—again another complex valuation issue.

As for the **cash flow test**, the **question becomes when is the entity insolvent**? At the point when it actually defaults on a debt or at an earlier point when it will not be able to pay its debt in the future. **In either case, we continue to maintain that the cross covenant acceleration clause is key to this— without it, the 8% unsecured notes would be long- term and not due within the current operating cycle. This would give time for commodity prices to continue to increase and enable EVEP to attain compliance of the EBITDAX to total debt ratio which is accelerating the 8% notes**. We have provided our input

to the Court in our prior letters and we continue to maintain this is key to this Petition. Mr. Weiland states that "cross-acceleration provision did not cause the Debtors' bankruptcy filing or resulting classification of the Debtors' note obligations as current obligations" <u>when in fact the cross default accelerated the senior 8% notes by classifying them as a current liability so I disagree as I can't see how the Petition would be valid otherwise</u>. If debt remained as long term for the 8% notes, would the insolvency argument hold under the cash flow test above, since EVEP would not be insolvent as it is able to pay all amounts through the April 2019 due date of the 8% notes? If not, then EVEP is solvent at this point and the balance sheet test is irrelevant and the Court should consider a reasonable time in order to demonstrate compliance with the EBITDAX to total debt ratio and not allow the prepackaged bankruptcy to be rushed through, particularly **since we have significant questions related to the valuation process itself as described further below**.

- As a reminder, the Bank debt (credit facility) is fully secured so it seems reasonable to assume as the secured lender, they would waive the EBITDAX to total debt ratio violation for a reasonable time until compliance with the ratio is attained (and management disclosed additional borrowing capacity which demonstrates based on borrowing base, they are not worried about their position). The EBITDAX to total debt ratio is close to begin with as I demonstrated in my earlier letter, and <u>EVEP could easily sell assets in the current environment to pay down debt or increase EBITDAX from the rising current commodity environment—</u>both should get them into compliance.
- A waiver obtained by senior secured lender for its EBITDAX to total debt ratio along with the pay down of debt to note holders would allow them to have a better leverage model without wiping out the common unitholders in the process.

**So to summarize, <u>EVEP would have to fail either the balance sheet test (through valuation process) or cash flow test. This appears to be developed in case law which is why we are appealing this to the Court. We continue to maintain that an Equity Committee be appointed to look at all the moving parts in this case and put another set of independent eyes through an equity committee and independent valuation process for the common unit holder in order to give them fair representation as management has a fiduciary responsibility to its common unitholders.</u>**

*The statement that Debtors are "hopelessly insolvent…as equity is not entitled to receive a recovery in a sale of liquidation" uses the concept of "hopelessly insolvent" as a basis for not appointing an official equity committee.*

Mr. Weiland states that "there is no justification for the appointment of an equity committee in these Chapter 11 cases". He further states that "<u>if equity holders</u>

<u>can demonstrate something more than remote likelihood of a recovery, courts also consider other factors (i.e. complexity of the case, costs to Debtors estates of equity committee)</u>". In response, <u>we believe this is a very complex case with valuations and other factors discussed below and an amount of reasonable fees should **not** be a burden to the Estate for establishing an equity committee and legal counsel to sift through all the information and request an independent valuation be performed by a large, reputable valuation firm in the oil /gas industry.</u> **<u>The fees paid by EVEP for the Debtors and legal counsel related to the work to build a case for the Petition are certainly not insignificant (probably in the $1.5 to $2 million range) in relation to their interest ($650 million face value). I remind the Court that the unitholders are paying for this through EVEP's operations, so what about the common unitholders interests and shouldn't they have equitable fees allocated as well your Honor?</u>**

I am certainly not a valuation expert but I do understand the basic concepts from an audit perspective which is why I am saying this is a very complex valuation, with moving parts and we need a **<u>qualified, independent valuation firm's opinion of EVEP's enterprise value. Not just a fairness opinion.</u>** Debtors investment banker (PWP) prepared a liquidation analysis which serves as the basis for saying the Debtors are receiving minimal recovery and equity holders are therefore out of the money. PWP then determines Enterprise Value using certain financial analysis performed by PWP to arrive at estimated range of Enterprise Value—**<u>in my audit experience, this was not a sufficient formal valuation as further discussed below.</u>**

- PWP even states on pg. 3 that "**it did not verify the projections in connection with PWP's estimates of enterprise value and equity value and no independent valuations or appraisals were sought or obtained in connection herewith**".

To further demonstrate why a **<u>fairness opinion differs from a formal valuation that should be used to determine the Enterprise Value,</u>** I attached *Exhibit 1* for the Court. Although the author cites specific Canadian case law, the same concepts would apply to challenge the analysis prepared by PWP used as the basis for the Petition presented in Mr. Weiland's letter:

- Purposes are different - a <u>fairness opinion rarely includes the detailed analysis, methodology and analysis that is included in a formal valuation</u>
- <u>Fairness opinion offers little transparency into the analysis undertaken</u> in reaching the conclusion and leaves the reader with an inability to thoughtfully critique the opinion rendered
- Doesn't disclose the "number crunching" <u>which then can be subjected to further diligence and comparison to key assumptions included in other</u>

projections management uses (i.e. for internal purposes, discounted cash flows related to impairment analysis, etc.)

*The statement that "existing equity is not entitled to a recovery under a fair and accurate valuation".*

Mr. Weiland includes Exhibit B in his letter dated April 12, 2018 and I want to give the Court another **example of management's inconsistent valuations.** Per EVEP's website, Citi MLP/Midstream Infrastructure Conference on August 17, 2016 (relevant portion attached as *Exhibit 2*), **showed a $743 million enterprise value.** (This was in 2016 when oil was approx. $43 and natural gas was approx. $2.49.   Oil is now almost $70 and natural gas close to $3. **Total Enterprise Value shown by PWP is $500 million midpoint enterprise value—or a difference of almost $250 million.  Commodity prices were much lower and yet management presented a valuation to investors that was $250 million higher than the one they are using now to try to convince the Court that existing equity is not entitled to a recover under "a fair and accurate valuation".**

**This is a critical point as I do not believe what was submitted is sufficient documentation to serve as the Enterprise Value.** Further, CODI issue is significant to the common unitholders **and the valuation is key as to how much CODI will be attributable to them**. **The lower the value, the higher the CODI risk.** Mr. Weiland states "many equity holders will likely recognize losses that offset all of any cancellation of debt income and potentially income from other sources".

- CODI is a complex concept which many investors do not understand. Basically, the equity holder in an MLP is allocated ordinary income at the time of the event for the difference between the debt forgiven and the value they obtain in the new entity while the amount of such income is added to their basis (capital income/loss) upon disposition. How can he determine for the unitholder if they have sufficient ordinary losses in the same period as they get CODI?  In fact, many small investors are likely to be shocked by this when tax time comes around—not only did they have a loss on the unit but then hit with ordinary income on top of that (one is capital gain/loss calculation as additional basis) and CODI is ordinary income.

EVEP wants a pre-packaged bankruptcy and although we acknowledge that the equity committee would potentially delay this, there is much to absorb in a short time period with a lot of questions and valuation issues that need to be vetted by independent parties.  EVEP is able to pay current liabilities when due (in fact has $13 million in positive working capital at December 31, 2017 without the acceleration), has sufficient cash flow from operations, improved commodity

pricing which will increase EBITDAX as demonstrated in my April 12th letter--- **so why the rush when the note maturity is one-year away?**

Mr. Kent is just asking for a fair shot as a significant equity holder—he will live with the outcome but strongly believes that this case warrants an equity committee. Based on my diligence in this case over the last month (since this was announced) and from my extensive experience as an Audit Director, I agree with him that an equity committee is needed at this point to represent the 46 million common units outstanding (exclusive of Mr. Walker's). That is only fair as Debtors and management, by their own admission through Form 8K filings, have been contemplating this since October (over 6 months ago) while this was sprung on the unitholders just last month.

*The statement that "appointment of an examiner would be unnecessary and inappropriate and should be appointed if third-party investigation is in the best interest of creditors and the estates and appropriate under the circumstances".*

We believe we have demonstrated the need for another set of independent eyes on this through our letters to the Court. Specifically:

- We continue to question the related party acquisitions (mainly the $259 million related party acquisition from EnerVest in 2015 and whether this was conducted on an arms-length basis. Also, a fairness opinion is not the same as a valuation report as discussed above. An independent formal valuation report would then be subject to further audit procedures (including review by Deloitte's internal valuation specialists) so was this done?
    - I question this as a presumably a DCF analysis would have been prepared at the time of the acquisition (which should have considered forward commodity spot prices) in order to determine what a willing buyer/seller would pay for the properties. EVEP allocated a significant amount to residual (goodwill) of ¼ of purchase price which was written off within one quarter so why—(unless the purchase price was too high to begin with from EnerVest—a related entity owned by the same management team that is running EVEP)?
    - Clearly a material acquisition with goodwill write off within a short time frame. Also, Belden (included in the acquisition) had significant loss on a proforma basis as shown in the disclosure before it was purchased from EnerVest so how was this purchase from EnerVest in the best interest of EVEP unitholders? Lastly, I submitted in my April 12th letter, a timeline of EnerVest purchases of other properties at the same time these sales of potentially inferior properties (i.e. Belden) to EVEP so were they using proceeds from sales to

EVEP as a vehicle for EnerVest to upgrade its own asset portfolio at the same time?
- Again, **related party transactions have heightened visibility due to their nature and require scrutiny, including appropriate audit procedures (i.e. use of qualified, independent specialists—not simply fairness opinions which are typically intended for other purposes).**

• We continue to maintain lack of appropriate disclosure with respect to the cross-covenant (default) provision. A Form 8K filed in 2011 and other registration statements filed in 2012 does not relieve management from required disclosure of material items annually in its audited basic financial statements included in Form 10K and Annual Reports. Form 8K is typically used for intervening period between periodic reports to disclose a specific list of events that are presumed material, such as new material agreements, which is why a Form 8K was filed in 2011 when the Indenture Agreement was entered into. The cross covenant was never disclosed in the basic audited financial statements until December 31, 2017 when debt was accelerated. Again, I use the lens of what would a reasonable investor expect to know and if it is material, it needs to be in the basic audited financial statements.
- Mr. Weiland states that "cross-acceleration provisions are entirely typical in high-yield indentures" which is true for the bondholders who understand this (institutional investors) but without disclosure in the basic financial statements how is the equity unitholder expected to know this when they read audited financial statements to base their investment decisions upon as equity owners—not other ancillary SEC filings?

• The sale of EnerVest assets in Eagle Ford and Austin Chalk for $2.66 billion did not include EVEP's assets so EVEP is not able to monetize its assets (working interest of 5.8% in Eagle Ford), in the same area as the sale, to pay down its debt and potentially get into compliance.
- If EVEP were to be in compliance with the EBITDAX to total debt within a reasonable remedy period, why wouldn't the noteholders want to be whole rather than take a discounted value unless significant potential upside exists post-bankruptcy to them as 95% owners in new entity?
- A Form 8K was filed by TPG Pace Energy on March 20, 2018 related to the EnerVest asset sale above which contains a non-competition agreement for a four-year period

> between EnerVest and buyer that specifically restricts EV Ltd. and "certain affiliates" from competing with Magnolia (new company) in the Eagle Ford Shale. Is EVEP an affiliate as defined and if so, what impact does this have to EVEP and will it get compensated for this non-compete agreement? Are EVEP's Eagle Ford assets compromised as a result of this non-compete clause—if the answer is yes, then how does this benefit EVEP unitholders? It seems detrimental to me since EVEP can't freely sell its underlying property in Eagle Ford.
>   - Pay downs of debt could have been made instead of purchasing more assets (Eagle Ford purchase for $58.7 million and additional borrowings of another $6 million in January 2017, and also the $2.7 million in August 2017, or almost $70 million which would have definitely "moved the needle" in terms of EBTIDAX to total debt ratio compliance at Q1 2018.
>   - I also disagree that management could not have disclosed the ratio at Q1 2018 as the audited financial statements were filed in the Form 10K on April 2, 2018 so management should have been able to close Jan, Feb and estimate March results to disclose it in the Liquidity Section of the Form 10K as of the April 2nd Form 10K filing date so the investor could understand how close it actually was.

*The statement that "Debtors received refinancing proposals from three separate sources and that none would have provided a path to address the impending 2019 maturities of the senior notes".*

> **Based on the significant concerns cited above related to valuations and underlying assumptions, what analyses were provided by management and its advisors to the three sources mentioned for them to conclude?** Further, Mr. Weiland discusses corporate governance and independent directors as it relates to the evaluation of strategic alternatives and that "a disinterested director" was added in late November (after EVEP had approved a new compensation and incentive plan for key executives, including Mr. Walker, had already proceeded with engaging Deloitte DRG and held discussions with noteholders as demonstrated by the Form 8K filings in Exhibits to my letter dated April 3rd ) So management had already concluded that they had no path to address the 2019 note maturity (which at the time was about 18 months away) and they were well on their way to the restructuring path before the disinterested director was added.

Attached (*Exhibit 2*) is EVEP's corporate structure at December 31, 2017, which I would like to remind the Court of. To summarize, all activities are managed by EnerVest (EnerVest owns EVEP's general partner, EV Management). EVEP's general partner is not elected by unitholders <u>although it owes a fiduciary duty to its common unitholders.</u> There is no separation of the CEO and Chairman (Mr. Walker) and there is no lead independent director. The Board is appointed by EnerVest (or EnCap another related entity).

Mr. Weiland states that the "Debtors appointed a disinterested director on the Board and played an instrumental part in negotiating the terms of the Debtors plan and he states that as a reason not to appoint an examiner to duplicate these efforts." <u>I would submit to the Court that this be challenged</u> **<u>as was this sufficient to ensure that an independent viewpoint is considered as it relates to the common equity holders interests (who are the true owners of the business).</u>**

- <u>I would further ask whether the audit committee approved the non-audit services provided by Deloitte CRG to ensure independence is maintained (SOX Section 201 and 202 require that audit committees pre-approve allowable services to be provided by the auditor of the issuer's financial statements), assuming that restructuring services are not prohibited services as defined under Section 201</u> (which I did not verify but if pre-approval process was in place, the audit committee would have vetted this). Item 14 in Form 10K shows $20,000 in fees so how were the fees paid to advisors handled—were they paid at general partner level and then shown as reimbursement of expenses included in the $20 million reimbursement to EnerVest in 2017?

<u>Again,</u> **<u>as an experienced auditor I question this governance structure as it relates to the fiduciary duties to the equity owners of this entity and whether they are getting a fair shot in this bankruptcy since the unitholders interests are essentially being wiped out by this and are not fairly represented in the process.</u>**

In summary, we believe the above fact pattern supports our position that an equity committee be established with its own legal counsel, in order to analyze this further on behalf of the 46,000,000 units outstanding (exclusive of Mr. Walker's as he has been party to the restructuring discussions and has more information than the rest of the unitholders). The Debtors and management had over six months to analyze this complex restructuring, worked with its advisors and attorneys while the unitholders were left in the dark with respect to the bankruptcy and essential elimination of their equity in EVEP. I am not a bankruptcy expert and I realize that management has engaged other experts, namely Deloitte DRG and Kirkland & Ellis to assist them; however in the final analysis, it just does not seem fair to proceed with a prepackaged plan when it has <u>not</u> been sufficiently vetted by an equity committee, particularly since creditors are not

impacted and liabilities are being paid through normal working capital. Your Honor, there are sufficient questions I have as an Audit Director with many years of experience (including due diligence for acquisitions) to make me stop and question certain things on behalf of Mr. Kent's equity interest. I am trying my best to evaluate all factors but in the final analysis, I really can't see a valid reason to deny request for an equity committee. And I further ask the Court whether an Examiner is needed as well, based on our questions and concerns outlined above.

Respectfully Submitted to the Court effective April 20, 2018,

Nada Barrett, CPA
Fresno, CA
nada@nbarrett.com