**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **EV ENERGY PARTNERS, L.P.,** *et al*[1] | ) | Case No. 18-10814 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:** |
| | ) | **May 15, 2018 at 10:00 a.m.** |
| | ) | |
| | ) | **Objection Deadline:** |
| | ) | **May 8, 2018 at 4:00 p.m.** |
| | ) | |
| | ) | **Re: Docket No. 6.** |
| | ) | |

**UNITED STATES TRUSTEE'S OBJECTION TO THE JOINT
PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
FOR EV ENERGY PARTNERS, L.P. AND ITS DEBTOR AFFILIATES**

In support of the United States Trustee's Objection (the "Objection")[2] to the confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization for EV Energy Partners, L.P. and its Debtor Affiliates (D.I. 6) (the "Plan"), Andrew R. Vara, the Acting United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned counsel, states as follows:

**I.    JURISDICTION, BACKGROUND AND RELEVANT FACTS**

1.    Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative oversight of cases commenced pursuant to Title 11 of the United States Bankruptcy Code. Section 586(a)(3)(G) requires the U.S. Trustee to monitor "…the progress of cases under title

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: EV Energy Partners, L.P. (5690); EV Properties, L.P. (5543); EV Properties GP, LLC (3943); EnerVest Production Partners, Ltd. (8619); EVPP GP, LLC (8340); CGAS Properties, L.P. (7277); EVCG GP, LLC (7274); EnerVest Monroe Marketing, Ltd. (7606); EnerVest Monroe Gathering, Ltd. (7608); EV Energy GP, L.P. (5646); EV Management, LLC (5594); EV Energy Finance Corp. (3405); Belden & Blake, LLC (6642); and EnerVest Mesa, LLC (1725). The Debtors' service address is: 1001 Fannin Suite 800, Houston, TX, 77002.

[2] This Objection addresses the remaining objections to the Plan. The parties resolved other objections and issues such as the breadth of persons and parties entitled to exculpation and other confirmation-related issues.

11" and further requires that the U.S. Trustee take "such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress."

2. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard in this matter.

4. These cases were filed on April 2, 2018 (the "Petition Date"). In support of the first day relief and the filing of these cases, the Debtors submitted the Declaration of Nicholas P. Bobrowski in Support of the Chapter 11 Petitions and First Day Motions (the "Bobrowski Declaration") (D.I. 8).

5. Prior to the Petition Date, the Debtors reached an agreement with 100 percent of lenders holding secured claims in value under a reserve-based facility (the "Consenting RBL Lenders"), noteholders holding approximately 70 percent of senior notes in value (the "Consenting Noteholders"), and non-Debtor affiliates, EnerVest, Ltd. ("EnerVest"), and EnerVest Operating, L.L.C. (together with EnerVest, the "EnerVest Parties"), for a consensual balance-sheet restructuring. *See* Bobrowski Declaration at ¶ 5.

6. This agreement was memorialized in a Restructuring Support Agreement (the "RSA") that provides that the Debtors, the Consenting RBL Lenders, the Consenting Noteholders, and the EnerVest Parties would pursue a consensual, prepackaged chapter 11 plan

of reorganization (the "Plan"). Accordingly, the Debtors commenced solicitation of the Plan on March 14, 2018, and each class of claims entitled to vote voted to accept the Plan by the March 30, 2018 voting deadline. *See* Bobrowski Declaration at ¶ 6.

7. The Plan generally provides that:

- administrative expense claims will be paid in full (a) on or as soon as reasonably practicable after the effective date, (b) on or as soon as reasonably practicable after the administrative claim is allowed, or (c) on the date the claim becomes due, or, in the case of priority tax claims, treated in accordance with section 1129(a)(9)(C);

- holders of claims arising under the Debtors' prepetition RBL credit agreement that vote to accept the Plan will receive new revolving loans under the amended RBL credit facility, cash in an amount equal to the accrued but unpaid interest and letter of credit fees payable to such holder, and unfunded commitments and letter of credit participation under the amended RBL credit agreement;[3]

- holders of claims under the Debtors' senior notes will receive their *pro rata* share of ninety-five percent of the new common stock of the reorganized Debtors' parent entity;

- holders of general unsecured claims will be paid in full on or before the effective date of the Plan or in the ordinary course of business consistent with past practices;

- holders of existing equity interests in EV Energy Partners, LP ("EVEP") Debtors will receive their *pro rata* share of five percent of the new common stock of the reorganized Debtors' parent entity and new warrants for the new common stock;

- other secured claims will be paid in full, reinstated, or treated in accordance with section 1129 of the Bankruptcy Code; and

- other priority claims will be paid in full, or if payment is not due, in the ordinary course, or treated in accordance with section 1129(a).

Bobrowski Declaration at ¶ 5.

---

[3] Under the Plan, holders of claims arising under the Debtors' prepetition RBL credit agreement that voted to reject the Plan or failed to properly submit a ballot would receive term loans in an amount equal to the principal amount of their allowed RBL facility claim and cash in an amount equal to the accrued but unpaid interest payable to such holder, but since all prepetition RBL lenders voted to accept the Plan, no RBL lender will receive such treatment.

8. The Plan will become effective within seventy-five days after the Petition Date (June 16, 2018) and Plan confirmation is scheduled for May 15, 2018.

## II. LAW AND ARGUMENT

9. In *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that the plan proponent bears the burden of proof with respect to confirmability of a plan: "The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation." *Id.* at 599.[4]

10. Here, the Debtors fail to meet the standards of section 1129 because the releases and limitation of liability provisions in the Plan run contrary to the standards enunciated in *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011*), In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011), and other applicable law as detailed below.

11. In addition, the Plan improperly provides for the payment of professional fees of creditors in contravention of applicable law.

### A. The Plan's Releases Are Overly-Broad and Non-Consensual.

12. In general, Debtors and third parties may grant releases to non-debtors if the releases are consensual.[5] However, non-consensual third party releases of non-debtors may be approved under "special circumstances" if the releases are fair, necessary to the reorganization,

---

[4] *See, e.g. In Re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 221 (Bankr. D.N.J. 2000) (the plan proponent bears the burden of establishing the plan's compliance with each of the requirements of section 1129 of the Bankruptcy Code.).

[5] *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("[A]ny third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases").

and the Debtors present facts sufficient to enable the Court to make those findings.[6] Courts use five factors, none of which are exclusive or conjunctive, to evaluate fairness: identity of interest between the debtor and non-debtor, substantial contribution by the non-debtor, the necessity of the release to the reorganization, overwhelming acceptance of the release by creditors, and payment of all claims and interest holders under the plan.[7] Simply performing duties that the bankruptcy process requires, such as negotiating and proposing a plan, is not a contribution that entitles a third party to a non-consensual release.[8] Without evidence of contribution, and the identification of each party receiving a release, non-consensual third party releases should not be approved.[9]

13. The Plan grants broad releases to many non-Debtor parties both by the Debtors and by creditors and other parties in interest.[10] Unimpaired creditors, including general unsecured creditors who cannot vote, did not consent to these releases. More importantly,

---

[6] *Gillman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203, 214 (3d Cir. 2000) ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability").

[7] *In re Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del 1999).

[8] *Washington Mutual, Inc.*, 442 B.R. at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors , . . . . [as] [t]he only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan, [which] activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated) . . . .").

[9] *See id.* (disallowing releases in favor of unidentified affiliates because of lack of evidence as to the identity of the affiliates and why each should get a discharge without its own bankruptcy case).

[10] Under the Plan, "Released Parties" means collectively, in each case solely in their respective capacities as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders and all other Senior Noteholders; (c) the Indenture Trustee; (d) the Ad Hoc Committee of Noteholders; (e) the Consenting RBL Lenders; (f) the RBL Agent; (g) the Amended RBL Credit Facility Agent; (h) each of the EnerVest Parties; and (i) with respect to each of the foregoing entities described in clauses (a) through (h), such entity's current and former affiliates, partners, subsidiaries, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective successors and assigns, in each case in their capacity as such. Article I, Section 121 of the Plan. See also Article I, Section 122 and Article VII, Sections C and D of the Plan.

impaired creditors who also cannot vote are bound by the releases but did not consent to any releases. These parties are not only unknowingly releasing their present claims; they are releasing claims that do not yet exist, but that may exist in the future ("existing or hereafter arising"). They are also releasing a multitude of claims, which may have only nominal relation to the Debtors.

14. The Plan's release language releases claims that parties[11] may not yet know about, may discover in the future, or about which they may discover new information. In other words, creditors that cannot vote are releasing all past, present, and future claims that may in any way, however remote, relate to the Debtors, regardless of whether they know about them and are doing so before the Debtors are required to pay them. Even worse, each holder of a Claim or Existing Equity Interest that is deemed to reject the Plan and that does not affirmatively elect to "opt-out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions will be bound by the Plan's third-party release provisions.[12] These parties did not receive a ballot and could not opt-out of the Plan's releases by simply submitting a ballot with the opt-out box having been marked. These parties are required to obtain a copy of the Plan and

---

[11] Under the Plan "Releasing Parties" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the Consenting RBL Lenders; (c) the RBL Agent; (d) the Consenting Noteholders; (e) the Indenture Trustee; (f) the EnerVest Parties; (g) each holder of a Claim entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (h) each holder of a Claim or Existing Equity Interest that is Unimpaired and presumed to accept the Plan; (i) each holder of a Claim or Existing Equity Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; and (j) with respect each of the Debtors, the Reorganized Debtors and the foregoing entities described in clauses (a) through (i), such entities' current and former affiliates, and such entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns. Article I, Section 122 of the Plan.

[12] See Article I, Section 122 of the Plan.

submit some sort or form of objection to the Plan which may require them to hire counsel. It cannot be said that permitting third-party releases to take effect under such circumstances are consensual.[13]

15.     The Plan's releases are inappropriate and too broad, both in the parties being released, the parties doing the releasing, and the time period covered. The Debtors have the burden of proving that each release is fair and necessary, that each Releasing Party consented, and that each particular and specific Released Party contributed to the reorganization. The Debtors have failed to meet that burden. Thus, the releases should not be approved.

**B.     The Payment of Restructuring Expenses is Not Authorized Under Applicable Law.**

16.     Article XII, Section C of the Plan[14] provides for the payment of certain fees and expenses as follows:

> On the Effective Date, all Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date shall be paid in full in Cash, without the requirement to file a fee application

---

[13] The U.S. Trustee also objects to the broad definition of "Releasing Parties," which includes current and former employees, shareholders and professionals of such Releasing Parties. With respect to the releases being granted by such parties, there has been no consent, no notice and no consideration. Such releases are therefore not permissible under applicable law.

[14] Paragraph 7(c) of the RSA (D.I. 8-2) provides as follows: "The Debtors shall pay the reasonable and documented fees and expenses of: (i) the ad hoc committee of Noteholders (the "Ad Hoc Noteholder Committee"),7 whether incurred before or after the Petition Date, limited to the reasonable and documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), as lead counsel, one local counsel and Intrepid Partners, LLC, as financial advisor (together, the "Consenting Noteholder Advisors"), in each case, after receipt of applicable invoices and in accordance with engagement letters of such professionals; and (ii) the RBL Agent, whether incurred before or after the Petition Date, limited to the reasonable and documented fees and expenses of Simpson Thacher & Bartlett LLP, as lead counsel ("Simpson Thacher"), one local counsel, and RPA Advisors, as financial advisor (together, the "RBL Agent Advisors"), in each case, after receipt of applicable invoices; provided that the timing of the payment of such fees and expenses incurred after the Petition Date shall be subject to the terms of the Cash Collateral Orders and/or the Pre-Packaged Plan; provided, further, that the Debtors shall also promptly reimburse each member of the Ad Hoc Noteholder Committee and each Consenting RBL Lender in cash for all reasonable and documented out-of-pocket costs or expenses (which expenses shall not include additional professionals' fees without the prior written consent of the Debtors) incurred by such Ad Hoc Noteholder Committee member or such Consenting RBL Lender in connection with this Agreement or the Restructuring."

with the Bankruptcy Court and without the requirement for Bankruptcy Court review.[15]

Article XII, Section C of the Plan.

17. The glaring problem with this provision is that it provides for the payment of professional fees and expenses without identifying or specifying the legal basis or justification for such payments under the Bankruptcy Code.[16]

18. In particular, these professional fee payments relate to parties and professionals whose compensation is specifically statutorily governed by sections 503(b)(3)(D), 503(b)(4) and 503(b)(5) of the Bankruptcy Code.[17] Although such professionals may be eligible to be compensated from the bankruptcy estate, section 503 imposes detailed requirements that must be

---

[15] Article I, Section 128 of the Plan defines "Restructuring Expenses" to mean collectively, all reasonable and documented fees and out of pocket expenses of one primary counsel to the *Ad Hoc* Committee of Noteholders, Akin Gump Strauss Hauer & Feld LLP, one local counsel to the *Ad Hoc* Committee of Noteholders (if necessary), one financial advisor to the *Ad Hoc* Committee of Noteholders, Intrepid Financial Partners, one primary counsel to the RBL Agent, Simpson Thacher & Bartlett LLP, one local counsel to the RBL Agent, Richards Layton & Finger LLP, and one financial advisor to the RBL Agent, RPA Advisors, LLC, in each case, that are due and owing after receipt of applicable invoices, without any requirement for the filing of fee or retention applications in the Chapter 11 Cases, with any balance(s), including estimates of fees and expenses to be incurred through the Effective Date, paid on the Effective Date.

[16] It would be incongruous to treat these professionals differently than the creditors who they represent. Holders of prepetition RBL facility claims are receiving new revolving loans under an amended RBL credit facility while holders of Senior Notes claims will receive their pro rata share of 95% of the new common stock of the reorganized Debtors' parent entity. However, the Plan in essence treats these professionals akin to general unsecured creditors who will also be paid in full on or before the Effective Date.

[17] Article IV. Section Q of the Plan provides for the payment of the RBL Agent Expenses on the Effective Date in cash in an amount equal to the RBL Agent Expenses which are the reasonable and documented fees and out-of-pocket costs and expenses, incurred on or prior to the Effective Date by the RBL Agent that are required to be paid under the RBL Credit Agreement, the RSA or the Cash Collateral Orders. Such amounts shall include the reasonable and documented fees and out of pocket expenses of incurred by one lead counsel, one local counsel, and one financial advisor to the RBL Agent in connection with the Chapter 11 Cases. Article I. Section 112. Under section 506(b) of the Bankruptcy Code four requirements must be satisfied in order for attorney's fees and costs to be allowed as part of a creditor's claim: (1) the creditor must have an allowed, secured claim; (2) the creditor must be oversecured; (3) the underlying documents must provide for such fees and costs; and (4) the amount of the claim for fees and costs must be reasonable., *See In re West Electronics, Inc.* 157 B.R. 38, (Bankr. D.N.J. 1993) (citing *In re Wire Cloth Prods., Inc*., 130 B.R. 798, 814 (Bankr. N.D. Ill. 1991). Provided that the RBL Agent and the RBL Expenses satisfy the requirements of section 506(b) identified herein, the RBL Agent Expenses may be paid as part of the RBL Facility Claims, otherwise the RBL Agent Expenses are subject to the requirements of section 503(b)(3)(D) and (b)(4) and this objection likewise applies with full force and effect to the RBL Agent and the payment of the RBL Agent Expenses.

met before approval and payment, including the timely filing of a request for payment by the professional, *see* 11 U.S.C. § 503(a); notice and a hearing before the court, *see* 11 U.S.C. § 503(b); a showing that such expenses were "actual" and "necessary," *see* 11 U.S.C. § 503(b)(3); a showing that the creditor, unofficial committee, or indenture trustee has made a "substantial contribution" to the bankruptcy case, *see* 11 U.S.C. § 503(b)(3)(D); and a finding by the court that any compensation paid to an attorney or accountant is "reasonable." *See* 11 U.S.C. § 503(b)(4).

19.   Any such party's right to payment under section 503(b) is not automatic but "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). The Debtors have not provided a legal justification to support or authorize the payment of such fees under the Plan or whether such professionals are required to and could satisfy section 503(b)[18].

---

[18] Section 503(b) (3) (D) of the Bankruptcy Code provides for the allowance administrative expenses of the estate for the "actual, necessary expenses" incurred by a "creditor" or an "equity security holder... in making a substantial contribution in a case." Section 503(b) (4) provides for the allowance for the "reasonable compensation for professional services rendered by an attorney or an accountant if an entity whose expense is allowable under" section 503(b) (3). Section 503(b)(5) permits the allowance of reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a Chapter 11 case based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title. These provisions are governed in this District by the Third Circuit's decision in *Lebron v. Mechem Financial, Inc.*, 27 F.3d 937 (3d Cir. 1994). A creditor makes a substantial contribution if its efforts provide an "actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mechem Financial Inc.*, 927 F.3d at 943-44 (citation omitted) (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)). *See also In re Worldwide Direct, Inc.*, 334 B.R. at 121. However, a benefit that the estate receives as an incident to a creditor's protecting its own interests is not a substantial contribution. *See Lebron*, 27 F.3d at 944. *See also In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174 (Bankr. D. Del. 2004) ("Inherent in substantial contribution, however, is the requirement that the benefit received by the estate be more than incidental to the applicant's self-interest."). Creditors are presumed to act in their own interest "until they satisfy the court that their efforts have transcended self-protection." *Lebron*, 27 F.3d at 944 (citations omitted). The activities that a Section 503(b)(3)(D) applicant has engaged in are "presumed to be incurred for the benefit of the engaging party and are reimbursable if, but only if, the services 'directly and materially contributed' to the reorganization." *Lebron v. Mechem Financial Inc.*, 27 F.3d at 943-44 (citation omitted), s*ee also In re Summit Metals, Inc*., 379 B.R. 40 (Bankr. D. Del. 2007), *aff'd*, 406 Fed.Appx. 634 (3d Cir. 2011); *In re Tropicana Entertainment LLC*, 498 Fed. Appx. 150 (3d Cir. 2012).

20. The Plan proponents and the specified professionals must satisfy the requirement that such creditors, and their professionals, have made a "substantial contribution" to these bankruptcy cases.

21. The fact that the payments of such professional fees are proposed as part of a chapter 11 plan does not relieve the third-party professionals of their obligation to comply with the requirements of section 503, which is the "sole source" of authority to pay post-petition professional fees on an administrative basis. *Davis v. Elliot Management Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283, 290 (S.D.N.Y. 2014). In *Lehman*, the court rejected an attempt by certain committee members to circumvent section 503(b)(4) by seeking payment under a "permissive" plan provision which purported to pay third-party professional fees without regard to whether they could be authorized under section 503. As that court explained, plans pay only claims and administrative expenses:

> Although the Bankruptcy Code does not explicitly forbid payments [of] professional fees that are not administrative expenses, no such explicit prohibition is necessary. Reorganization plans exist to pay claims and expenses . . . Therefore, the Individual Members' professional fee expenses are either administrative expenses or not, and if the latter, they cannot be paid under a plan.

*Id.* at 293. Indeed, the court recognized that any contrary result "could lead to serious mischief," since it would allow plan proponents to distribute the estate's assets without regard to the Bankruptcy Code's priority scheme. *Id.*

22. The *Lehman* court's reasoning applies with equal force here. Like the fees at issue in *Lehman*, the third-party professional fees "are either administrative expenses or not." *Id.* Because the third-party professionals seek to enjoy the benefits of administrative priority under section 503—the sole possible source of statutory authorization permitting them to be paid by the

10

Debtors in full on the Effective Date—they must also comply with the disclosure obligations and substantive limitations imposed by that section.

23. Even possibly apart from the applicability of section 503(b), Article XII, Section C of the Plan cannot be approved because it violates section 1129(a)(4) of the Bankruptcy Code.[19] That section provides that a court may approve a chapter 11 plan only if, among other things, the court finds that any payment made by the debtor "for services or for costs and expenses" in connection with the case has either "been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a) (4). In these cases, such fees and expenses can only be paid pursuant to the proper application of section 503(b).

24. Accordingly, the U.S. Trustee submits that the Court should not confirm the Plan unless the Plan and proposed Confirmation Order are amended and revised to: (i) set forth the legal and factual basis for the reasonableness of such payments; (ii) clarify that professionals subject to section 503(b), including without limitation professionals of the *Ad Hoc* Committee of Noteholders (and if applicable, the RBL Agent), shall be compensated only to the extent compensation is authorized and actually approved and awarded under section 503(b); and (iii) provide a reasonable opportunity for the U.S. Trustee and other parties-in-interest to object to such fees on any grounds, including without limitation the professionals' failure to satisfy the requirement of any portion or part of section 503(b).

---

[19] The U.S. Trustee does not suggest that section 1129(a)(4) may be used as a substitute for review under section 503(b). *See Lehman*, 508 B.R. at 294 n.9 (rejecting argument that section 1129(a)(4) could be used to authorize fees prohibited by section 503(b)). But even assuming that any of the proposed fees did fall outside the scope of section 503(b), they would nevertheless remain subject to the more general disclosure and court approval requirements of section 1129(a)(4). Under section 105(a) cannot be used to override the prohibitions of another section of the Code. *See In re Combustion Engineering, Inc.,* 391 F.3d 190, 236 (3rd Cir. 2004) ("The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself"); *see also Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.") (citations omitted).

## III. CONCLUSION

25. The U.S. Trustee reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter, amend and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery and cross-examine any and all witnesses in support of the Motion.

WHEREFORE, the U.S. Trustee respectfully requests that this Court grant relief consistent with this Objection and/or granting such other relief as this Court deems appropriate, just and appropriate.

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**REGION THREE**

Dated: May 8, 2018    By: */s/ Richard L. Schepacarter*
Richard L. Schepacarter, Esq.
Trial Attorney
U.S. Department of Justice
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)