**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| EV ENERGY PARTNERS, L.P., *et al.*,[1] | ) | Case No. 18-10814 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related D.I.:  6, 7** |

**OPT-OUT AND OBJECTION OF RK INVESTMENTS, INC.; JERRY ROGER KENT;
AND SELMA POZNANOVICH (I) TO THE ADEQUACY OF THE
DISCLOSURES IN THE DEBTORS' DISCLOSURE STATEMENT;
AND (II) TO CONFIRMATION OF THE DEBTORS' PLAN**

RK Investments, Inc.; Jerry Roger Kent; and Selma Poznanovich (collectively, the

"Objectors"), by and through their counsel, DLA Piper LLP (US), hereby (A) opt out of the

Releases proposed to be granted under the Plan and (B) object (this "Objection") (i) to the

adequacy of the disclosures in the *Disclosure Statement for the Joint Prepackaged Chapter 11

Plan of Reorganization of EV Energy Partners, L.P. and Its Debtor Affiliates* [D.I. 7] (the

"Disclosure Statement"); and (ii) to confirmation of the *Joint Prepackaged Chapter 11 Plan of

Reorganization of EV Energy Partners, L.P. and Its Debtor Affiliates* [D.I. 6] (the "Plan").[2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  EV Energy Partners, L.P. (5690); EV Properties, L.P. (5543); EV Properties GP, LLC (3943); EnerVest Production Partners, Ltd. (8619); EVPP GP, LLC (8340); CGAS Properties, L.P. (7277); EVCG GP, LLC (7274); EnerVest Monroe Marketing, Ltd. (7606); EnerVest Monroe Gathering, Ltd. (7608); EV Energy GP, LP (5646); EV Management, LLC (5594); EV Energy Finance Corp. (3405); Belden & Blake, LLC (6642); and EnerVest Mesa, LLC (1725).  The Debtors' service address is: 1001 Fannin Suite 800, Houston, TX 77002.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

## PRELIMINARY STATEMENT

1.      At its core, the Plan and accompanying Disclosure Statement contain both substantive and procedural deficiencies that render confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code untenable.  In addition, the Debtors have failed to provide adequate disclosure pursuant to 11 U.S.C. § 1125(a), particularly with respect to potential Avoidance Actions or other fraudulent or bad faith acts, and Claims and Causes of Action proposed to be released under the Plan.

2.      First, the Debtors' indefensibly low Valuation and Liquidation Analyses aside, the Debtors' equity holders are "in the money."  Moreover, the Plan provides for the Noteholders in Class 4 to potentially receive value in excess of their claims; all at the expense of the equity holders.  These gross deficiencies condemn the Plan to failure under section 1129(b)(1) of the Bankruptcy Code as it is not, and never could be "fair and equitable."

3.      Second, the Plan contains improper and overbroad Debtor Releases and Third Party Releases and Exculpation provisions.  The Released Parties have not made a substantial contribution to the Plan, and there are no unusual or unique circumstances here to justify such Releases and Exculpation.  Nowhere do the Debtors posit any evidence to the contrary.

4.      Third, the Plan has not been proposed in good faith.  As evidenced by the improper and overbroad Releases, the artificially, incredibly low Valuation Analysis, and the flawed Liquidation Analysis, the Plan is designed to strip value from equity holders to benefit the Debtors' affiliates, insiders, the RBL Lenders, and the Noteholders.

5.      Fourth, the Management Incentive Plan ("MIP"), under which Debtors' insiders are to receive a greater share (6%) of interests in the Reorganized Debtors than all of the Existing EVEP Equity Holders (5%), triggers concern as to potential breaches of fiduciary duty.  The

proposed MIP is deemed approved upon confirmation of the Plan, yet the MIP Term Sheet has yet to be filed, there is no transparency into the milestones, and the awards to be granted to insiders will not be disclosed.

6.      Turning to the procedural infirmities, the Disclosure Statement should not be approved because it fails to disclose significant prepetition events, omits any discussion of the availability of Avoidance Actions to increase recoveries, and raises serious questions with respect to the Debtors' and their affiliates' prepetition actions.  Without this information, creditors are unable to make any intelligent decision as to how to respond to the Plan.

7.      The Debtors have a fiduciary duty to maximize potential sources of recovery for all creditors and equity holders.  Pursuant to the Plan, the Debtors first and foremost seek to absolve themselves, their officers and directors, their affiliated entities and their lenders and noteholders from any and all causes of action.  The Debtors' failure to adequately disclose their assets, liabilities, prepetition activities, and the needed information to evaluate the Plan renders the Disclosure Statement inadequate and the Plan unconfirmable on its face.

8.      On May 7, 2018, the Objectors filed the *Motion of Certain Equity Holders for the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code and Bankruptcy Rule 2007.1* [D.I. 160] (the "Examiner Motion").  The Objectors are also seeking discovery from the Debtors and PWP with respect to valuation and the Debtors' prepetition activities, among other issues.  *See Notice of Service of Request for Production of Documents* [D.I. 167]; *Notice of Service of Rule 30(b)(6) Deposition* [D.I. 175].  The Objectors submit that it would be premature to approve the Disclosure Statement and confirm the Plan until the Examiner Motion is resolved or the examiner's investigation is complete.

## BACKGROUND[3]

9.       On April 27, 2017, the Debtors retained Perella Weinberg Partners LP ("PWP") as their restructuring financial advisor. *See Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Perella Weinberg Partners LP as Investment Banker and Financial Advisor for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [D.I. 102].

10.      A year later, on April 2, 2018 (the "Petition Date"), EV Energy Partners, L.P. ("EVEP") and its above-captioned debtor affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

11.      The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.      On April 4, 2018, the Court entered an order [D.I. 46] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

13.      The Objectors submitted letters to the Court and to the Office of the United States Trustee ("US Trustee") seeking the appointment of an equity committee [D.I. 43, 91, 96, 119, 120].  To date, no committees have been appointed or designated in these chapter 11 cases.

14.      Debtor EV Energy GP, L.P. ("EV Energy GP") is EVEP's general partner and Debtor EV Management, LLC ("EV Management") is the general partner of EV Energy GP. EV Management, in turn, is a wholly owned subsidiary of non-debtor EnerVest, Ltd. ("EnerVest"), one of the largest oil and natural gas companies in the United States.  EnerVest and certain of its

---

[3]      The Background section below is based upon publically available information, much of which is omitted from the Disclosure Statement.

affiliates hold a 71.25% ownership interest in EV Energy GP, which, in turn, owns a two percent general partner interest in EVEP and all of its distribution rights.

15.     Debtor EVEP was founded in 2006 as a publicly traded, master limited partnership specializing in the acquisition and operation and development of onshore oil and gas properties in the continental United States.  The Debtors are headquartered in Houston, Texas, and operate throughout the United States, with holdings in the Barnett Shale, the San Juan Basin, the Appalachian Basin, Michigan, Texas, Louisiana, Oklahoma, Arkansas, Kansas, and the Permian Basin.

16.     EVEP's primary assets consist of producing and non-producing oil, natural gas, and natural gas liquids ("NGL") reserves (collectively, the "Debtor Reserves"), which are a mixture of full and partial working interests that provide the Debtors with the right to drill, produce, and maintain wells in specific geographic regions.  The Debtors focus on developing and managing more mature assets and drilling in known reservoirs and do not serve as an operator for any of the Debtor Reserves; instead, the Debtors enter into contractual arrangements with non-debtor entities to serve as operators.

17.     As of December 31, 2016, the Debtor Reserves consisted of either partial or full working interests in approximately 21,500 gross operating oil and gas wells, and 13,800 net oil and gas wells.  EVEP owns interests in approximately 1,407,300 net acres (approximately 899,600 developed and 507,700 undeveloped) and had estimated net proved reserves, as of December 31, 2016,[4] of 854.2 billion cubic feet equivalent ("Bcfe"), consisting of approximately 12.6 million barrels of oil ("MMBbls"), 575.3 billion cubic feet ("Bcf") of natural gas, and 33.4 MMBbls of NGLs.

---

[4]     December 31, **2016** is the latest information the Debtors have disclosed.  Through this Objection and related discovery, the Objectors are seeking current information.

18.     The Debtor Reserves are located in nine principal regions: (a) the Barnett Shale; (b) the San Juan Basin; (c) the Appalachian Basin (which includes the Utica Shale); (d) Michigan; (e) Central Texas (which includes the Austin Chalk area); (f) the Mid-Continent areas in Oklahoma, Texas, Arkansas, Kansas, and Louisiana; (g) the Permian Basin; (h) the Monroe Field in Northern Louisiana; and (i) Karnes County, Texas.   Across these regions, EVEP's production for the nine months ended September 30, 2017 was approximately 46.5 Bcfe, consisting of approximately 1.0 MMBbls, 30.9 Bcf of natural gas, and 1.6 MMBbls of NGLs. For the first nine months ended September 30, 2017, the Debtors generated $34.3 million in net operating cash flows.

### A.     The 2014-2015 collapse of Funds XII and XIII

19.     The business strategy of EnerVest, launched in 1992, was to pool investor cash and use it to buy already producing oil and gas wells that were neglected by big oil companies. Once EnerVest bought them, it made improvements and drilled more to increase output.

20.     EnerVest's funds had a historical return of more than 30%, which enabled it to raise large pools of cash.  It did so to further increase returns, and in the process encumbered all of the funds' assets with the same debt, creating cross-default risks.

21.     In 2010, EnerVest founded EnerVest Energy Institutional Fund XII ("Fund XII"), for which it raised about $1.5 billion and added $800 million of debt.  Fund XII was fully invested and as of March 31, 2016 was approximately 65% paid out.

22.     Three years later, EnerVest founded EnerVest Energy Institutional Fund XIII ("Fund XIII"), for which it raised $2 billion and added $1.3 billion of borrowed money to boost its buying power.  Fund XIII was also fully funded, but as of December 2014 was only 5% paid out.

23.     As oil prices declined from more than $100 in 2014 to a low of $26, the value of EnerVest's assets, which served as collateral on the debt incurred to increase the funds' buying power, fell swiftly.  This price drop, combined with bank regulators requiring lenders to reduce the amount of energy loans on their books, triggered repayment demands from lenders that could not be met.  For example, one national bank with which EnerVest had senior secured facilities on both Fund XII and Fund XIII, reduced the borrowing base of Fund XII to $265 million and accelerated EnerVest's debt repayment to $125 million from $20 million

24.     Rather than selling assets at low prices to repay these debts, EnerVest attempted to recapitalize Fund XII by entering into a partnership with a new private equity company, with the hope that EnerVest could then divest the remaining assets in the Fund XII in a better commodity price environment.  However, the recapitalization never came to fruition.

25.     For Fund XIII, EnerVest attempted to raise approximately $300 million in second lien or unsecured capital and divest certain assets to reduce senior debt in anticipation of its lenders' May 2016 borrowing base redetermination.

26.     By July 2017, Fund XIII was essentially worthless, and EnerVest was in talks to sell Fund XIII assets, while still attempting to work with a private equity firm to recapitalize Fund XII and beginning to focus on EVEP's restructuring.

27.     None of the foregoing facts are disclosed in the Disclosure Statement.  All of the foregoing facts are material to a hypothetical investor's review of the disclosure materials and decision to vote on the Plan.

### B.     EVEP's 2015 Acquisitions

28.     On or about September 3, 2015, EV Properties, L.P. and CGAS Properties, L.P., wholly owned subsidiaries of EVEP, closed on agreements with EnerVest Energy Institutional Fund XI-A, L.P., EnerVest Energy Institutional Fund XIWI, L.P., EnerVest Energy Institutional

Fund X-A, L.P., EnerVest Energy Institutional Fund X-WI, L.P., and Capital C Energy Operations, LP to acquire oil and natural gas properties in the Appalachian Basin, San Juan Basin, Michigan, and Austin Chalk for a combined adjusted purchase price of $259.4 million.

29.    The sale closed on October 1, 2015 and was funded with cash and borrowings under EVEP's existing credit facility.

30.    The acquisitions included the purchase of 100% of the ownership in Belden & Blake Corp., which owned wells in the Appalachian Basin and in Michigan.  Other acquisitions included working interests in the Austin Chalk Basin, the Appalachian Basin and the San Juan Basin, all from EnerVest.

31.    In SEC filings following the closing of the sales, EVEP stated that it had a strong balance sheet with over $300 million of available liquidity in borrowing base capacity and cash and further opined that the acquisitions would provide incremental capacity to EVEP's borrowing base.

32.    Within 60 days following the closing, EVEP wrote down 25% of the value of the assets it had acquired from affiliates, suggesting that EVEP overpaid for the assets.

33.    None of the foregoing facts are disclosed in the Disclosure Statement.  All of the foregoing facts are material to a hypothetical investor's review of the disclosure materials and decision to vote on the Plan.

**C.    Oil Prices Are On An Upward Trend; Technology Is Driving Costs Down; Break-Even Is At All Time Lows**

34.    Beginning in late 2014, oil and natural gas prices entered a steep decline.  While they remain low vis-a-via their historic heights in mid-2014, the prices are currently on an upward trend, nearly three times the low point.

35.     Since the end of 2017 crude prices have inched higher, with US oil prices touching their highest since December 2014, supported by Organization of the Petroleum Exporting Countries ("OPEC")-led production cuts declining US inventories.  Robust demand, combined with geopolitical realities and currency movements have been the drivers of the oil markets, as inventories and imports continue to fluctuate.

36.     Additionally, US oil exports hit a record high of 2.3 million barrels per day in April 2018.

37.     As of the date of the filing of this Objection, West Texas Intermediate crude is trading at a price of $69.78, up from a low of less than $30 in the beginning of 2016, with Brent crude trading at $74.89, also up from a low of less than $30 in the beginning of 2016.

38.     During the same time period, technological advances have permitted the costs of extraction to decrease dramatically, driving down the break-even cost to produce.

39.     None of the foregoing facts are disclosed in the Disclosure Statement.  All of the foregoing facts are material to a hypothetical investor's review of the disclosure materials and decision to vote on the Plan.

## ARGUMENT

40.     The Debtors, as plan proponents, bear the burden of establishing all of the statutory requirements for confirmation of the Plan.  *See In re Exide Techs*., 303 B.R. 48, 58 (Bankr. D. Del. 2003).  This Court "has an independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied, even if no objections to confirmation have been made."  *In re Young Broadcasting, Inc.*, 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010).  In a case such as this one, in which an impaired class (Class 6) has been deemed to reject the Plan, "the plan proponent must also show that the plan meets the additional requirements of §1129(b), including the

requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of dissenting classes is fair and equitable." *See In re Exide Techs.*, 303 B.R. at 58; *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001); *Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000). As more fully discussed below, the Debtors have failed to meet these burdens, and the Court should not confirm the Plan.

**I.     The Plan Violates Bankruptcy Code Sections 1129(a) and (b) and Should Not Be Confirmed.**

41.     The Plan should not be confirmed because the Debtors have a total enterprise value that puts equity holders firmly "in the money". Therefore, any plan that denies them any recovery is not fair and equitable under black-letter law. The Debtors deem Class 6 Existing EVEP Equity Interests to reject the Plan, notwithstanding that the Plan provides a recovery on account of their interests. The Debtors disenfranchised the Existing EVEP Equity Interests to be certain. In a non-consensual case such as this one, Bankruptcy Code §1129(b)(1) provides that if all confirmation requirements of § 1129(a) other than § 1129(a)(8) are met, the court "shall confirm the plan notwithstanding...if the plan does not discriminate unfairly, and is fair and equitable" with respect to each non-accepting, impaired class of claims or interests. 11 U.S.C. §1129(b)(1). Section 1129(b)(2)(B), in turn, describes how a plan may be "fair and equitable" to a class of impaired, non-accepting claims or interests. 11 U.S.C. §1129(b)(2)(B). The "fair and equitable" standard "can be seen to have at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed." 7 COLLIER ON BANKRUPTCY ¶1129.03[4][a].

42.     The second foundational component of the "fair and equitable" requirement—that no creditor may be paid more than it is owed—may be briefly summarized: "[o]nce the participant receives or retains property equal to its claim, it may receive no more." 7 COLLIER

ON BANKRUPTCY ¶1129.03[4][a][ii].   Put differently, no claim holder may be paid a "premium" in excess of the allowed amount of its claim.  *Id.*  For this reason, a plan that proposes to pay unsecured creditors value in excess of their allowed claims is not "fair and equitable" under Section 1129(b)(2)(B) of the Bankruptcy Code, and may not be confirmed.  *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (citing *New England Coal & Coke Co. v. Rutland Co.*, 143 F.2d 179, 186 (2d Cir. 1944)) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated the junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48 at 61 (denying confirmation of plan that afforded secured lenders value in excess of the amount of their claims); *In re Genesis Health Ventures, Inc.*, 266 B.R. at 612 ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

43.    As the Plan proponent, it is the Debtors' burden to prove to this Court that the Plan does not afford any class value in excess of the amount of its claim.  *See, e.g., In re Armstrong World Indus.*, 348 B.R. 111, 120 & n. 14 (D. Del. 2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)); 7 COLLIER ON BANKRUPTCY ¶ 1129.02[4] ("If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

44.    Here, the Debtors seek to engage PWP as their investment banker and financial advisors pursuant to their April 20, 2017 retention agreement [D.I. 102].   The retention agreement expressly states:

> we shall have no responsibility for designing or implementing any
> initiatives to improve the Company's operations, profitability or
> cash management or to provide any fairness, valuation or solvency
> opinions or to make any independent evaluation or appraisal of any
> assets or liabilities of the Company or any other party.

Accordingly, Debtors have no credible valuation, as any valuation prepared by PWP is inherently unreliable because PWP is to be paid compensation based upon their valuation.

### A.    The Plan Fails the Best Interest Test of Section 1129(a)(7).

45.    Under section 1129(a)(7)'s best interests test, the Court cannot confirm the Plan unless the Plan provides each individual dissenting creditor at least as much as the dissenter would have received in a chapter 7 liquidation of the Debtors.[5]

46.    Section 1129(a)(7) "is an individual guaranty to each creditor or interest holder that it will receive at least as much in a reorganization as it would in a liquidation." 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7] (16th ed. 2016).    The plan proponents bear the burden of establishing that the best interests test is satisfied. *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000).

47.    To carry their burden, the Debtors must produce sufficient financial information about themselves, as well as their assets, liabilities, and prospects such that the Court is able determine whether the best interest of creditors test for confirmation has been satisfied. *See id.*

48.    The best interests test is generally satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under the plan than in a chapter 7 liquidation. *See In re Lason*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A)

---

[5]    Section 1129(a)(7) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if . . . [w]ith respect to each impaired class of claims or interests . . . each holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . ." 11 U.S.C. § 1129(a)(7).

requires a determination whether a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization") (internal quotation marks omitted). As explained herein, the Debtors' Liquidation Analysis is flawed in many respects and, therefore, cannot be relied upon as an accurate, or even a fair approximate, depiction of the Debtors' true liquidation value for purposes of satisfying section 1129(a)(7).

49.    For the reasons discussed below, the Debtors have failed to carry their burden to demonstrate that the Plan meets the requirements of the best interests test, and as a result, the Plan is unconfirmable on its face.

## B.    PWP's Valuation and Liquidation Analyses Are Flawed and Unreliable.

50.    Debtors claim this Court need not appoint an equity committee because "the debtors are hopelessly insolvent." (D.I. 93, Kirkland Letter at 6.) Debtors base this contention on two analyses prepared by PWP: (1) a liquidation analysis Debtors claim demonstrates "equity holders are out of the money by almost $250 million dollars" (*Id*. at 6.) and (2) that Debtors are "not entitled to a recovery under a fair and accurate valuation" because PWP's so-called "valuation" demonstrates "the midpoint enterprise valuation of the Debtors would need to increase by approximately $150 million for EVEP's existing equity holders to be entitled to better recovery outside the plan." (*Id*. at 6, 9) The Debtors are wrong on both accounts.[6]

51.    Most troubling, neither PWP nor the Debtors are willing to stand by PWP's analysis. Both Debtors and PWP made this abundantly clear in bold faced capital letters:

- **"NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN." [D.I. 93, Exhibit A at 2].**

---

[6]    *See generally* Aswath Damodaran, *Damodaran on Valuation* (2d ed. 2006), at pp.427-432 (valuation of oil and gas companies).

- **"BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PWP, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY." [D.I. 93, Exhibit B at 4].**

- **"ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE." [D.I. 93, Exhibit B at 4].**

52.    Because the Debtors have disclaimed the accuracy of PWP's analysis (an analysis for which PWP was not retained in any event) this Court cannot rely on it.

53.    What is more, PWP's analysis bears no relationship to public reports by the Debtors and there is no explanation why PWP's "valuation" is a mere 16% of the Debtors' "valuation" published only a few months before.  Debtors' own book value of $1.376 billion completely contradicts PWP's analysis.  At the end of 2017, EVEP was required to write down any assets on its books that were being carried above market value.  As EVEP explained in its most recent 10-K:  "We are required to perform impairment tests on our assets whenever events or changes in circumstances lead to a reduction of the estimated useful life or estimated future cash flows that would indicate that the carrying amount may not be recoverable or whenever management's plans change with respect to those assets."  2017 10-K at 34.  Consistent with that requirement, EVEP consistently wrote down the book value of its assets to ensure they were not overvalued.  For example, in 2015, EVEP recorded impairment charges of $136.7 million; in 2016, EVEP recorded impairment charges of $131.3 million; and in 2017 EVEP incurred impairment charges of $93.6 million.  2016 10-K at 29; 2017 10-K at 38.

54.    There is not, however, a manner consistent with GAAP to increase the value of an asset on a company's books in response to: (1) rises in the value of EVEP's assets as the oil and gas markets recovered, (2) reduced costs due to improving technology leading to increased margins and (3) improved transaction multiples signaling the beginning of a boom.  For example, a tax assessment for oil & gas assets held by EnerVest evidences that for county tax purposes between 2017 and 2018, the county appraiser, Prichard and Abbott Inc., estimates one well in Lee County, Texas increased in value by 214% in the last year alone.  *See* **Exhibit A**.  Moreover, due to advancements in drilling and completion techniques since 2014, the expenses associated with oil and gas assets are substantially down.    The chart below demonstrates that notwithstanding that prices have depreciated and remain lower than the high mark, technological advances have forced down the breakeven cost to produce, resulting in higher values.



55.    Thus, assuming EVEP appropriately accounted for the value of its assets, EVEP's book value of $1.376 billion should serve as a floor on its value as of December 31, 2017.  Indeed, unless EVEP's financial statements for the year end 2017 did not comply with GAAP or

PWP's analysis is wholly inaccurate, which the Objectors submit it is, the only legitimate explanation for the drop in value between December 31, 2017 (when EVEP last evaluated its assets for impairment) and the date of PWP's analysis is that an event occurred that caused the book value of those assets to drop by approximately 85% over a mere three month period.  Of course, the Debtors and PWP provide no explanation for this discrepancy in value, nor could they, as there is no evidence in the disclosures or from general market conditions indicating that EVEP's value materially declined in any respect during that brief three month time period.  To the contrary, as demonstrated by the chart below commodity prices have risen over that three month period, suggesting EVEP's value has risen, not declined.

| WTI Crude Oil and Henry Hub Natural Gas Historical Pricing | | | | |
|---|---|---|---|---|
| Period | WTI ($/bbl) | WTI 2018 % Change | HH Gas ($/Mcfe) | HH Gas 2018 % Change |
| 2018 Average (Jan 1 - April 2) | $62.91 | | $3.14 | |
| 2017 Average | 50.80 | 23.8% | $3.10 | 1.2% |

Source: U.S. Energy Information Administration

56.    In addition to the rise in oil and gas prices, the increase in oil and gas reserve values is further evidenced by higher reported transaction multiples such as dollar per thousand cubic feet of natural gas equivalents ("$/Mcfe") and dollar per barrel of oil equivalent ("$/boe"). The chart illustrates how transaction multiples in the first quarter of 2018 have risen approximately 18.0 percent and 4.0 percent from 2017 and 2016, respectively in the oil and gas basins in which EVEP operates – Barnett Shale, San Juan Basin, Appalachian Basin, Michigan – Antrim Shale, Central Texas – Austin Chalk, Mid-Continent Area, Permian Basin, Monroe Field, and Karnes County – TX.

57.    Against the backdrop of this objective market evidence demonstrating that EVEP's asset values are appreciating, not depreciating, and that equity holders are substantially in the money, it is unsurprising that PWP has shrouded its valuation analysis in secrecy and what

limited information Debtors do provide raises serious questions regarding the reliability of PWP's analyses.  In the description of PWP's "liquidation analysis," PWP's lack of transparency is glaring.  PWP fails to provide the supporting data used in the analysis as well as, detail on the significant amount of methodologies and assumptions required in the valuation of oil and gas reserves.  As a result, it is not possible to conduct an independent liquidation analysis.

58.    What information PWP does provide, however, indicates that the liquidation analysis substantially undervalues EVEP.  By way of example, PWP concedes that in preparing its liquidation analysis it did not assign any value to EVEP's Proved Developed Non-Producing ("PDNP") and other Proved Undeveloped ("PUD") reserves in Eagle Ford Shale that required capital in order to convert them into Proved Developed Producing ("PDP"), because PWP claims EVEP lacked the capital to convert these assets into PDP reserves and it cannot estimate the value of the resources the wells could produce.  This, however, makes no sense.  These are all "proved" reserves, meaning it is known with certainty that this acreage contains oil and gas assets, it just requires a capital investment to get those natural resources out of the ground and it is not atypical for producers to incur the costs and set off those costs against holders' non-working interests.  The idea that these reserves have absolutely no value in a liquidation to a third party is absurd to put it lightly.

59.    Eagle Ford is the most active shale play in the world with over 100 rigs running. https://eaglefordshale.com/  Operators are indicating the play will be developed for decades to come.  *Id.*  In fact, in 2013 alone almost ***$30 billion*** was spent developing the play.  *Id.*  In short, even if EVEP does not have the ability to invest capital in these non-producing reserves, PWP provides no explanation as to why they would have no value to a third party.  However, because EVEP has hidden the details related to PWP's analysis, including the reserve reports which value

these assets, the extent to which PWP's liquidation analysis understates the value of these assets cannot be determined.

60.    PWP's "estimated enterprise valuation of the reorganized debtors" likewise seeks to hide many of its flaws by not providing information in support of the apparent "valuation". For example, PWP indicates it determined the enterprise value of the reorganized debtors to have the nice round value of $500 million.  PWP, however, does not even provide such basic information as how it weighed its three accepted analyses, what multiples it relied on for its comparable company and precedent transactions analyses, what supposedly comparable companies and transactions it used, or any projections beyond 2019.  Not surprisingly, without even this basic information it cannot be determined with any precision whatsoever how PWP arrived at its suspiciously round midpoint value conclusion.

61.    While it is unclear what multiples PWP actually relied on, its summary states that "enterprise values are commonly expressed as multiples of various measures of operating and asset metrics such as EBITDA, production, and proved reserves."  EBITDA, however, is not a metric used to value assets in the oil & gas industry.  Rather, as reported in EVEP's most recent 10-K, it looks to Earnings Before Interest, Taxes, Depreciation, Depletion, Amortization and Exploration Expenses.  Accordingly, if PWP improperly relied on EBITDA (which cannot be determined from the disclosures) it follows that it improperly included Depletion and Exploration Expenses in assessing EVEP's value.  Such a fundamental mistake calls into question even further the reliability of PWP's analysis.

62.    Moss Adams, a Houston, Texas-based accounting firm well known in the oil and gas industry, was able to prepare a preliminary oil and gas reserves value analysis based on the limited information available which demonstrates PWP substantially undervalued EVEP's value.

Moss Adams determined that EVEP's value is between $860,000,000 and $1,066,000,000 (as contrasted with PWP's mid-point of $500 million), based on an application of the Guideline Company Method ("GCM") and Similar Transactions Method ("STM"), in conjunction with performing a net asset value ("NAV") analysis incorporating the book value of EVEP's other asset and liability accounts recorded on its balance sheet (e.g., cash, accounts receivable, accounts payable) as publically reported as of December 31, 2017.  The analysis was based on $/proved Mcfe reserve multiples, a metric heavily relied on in the oil & gas industry.

63.    Moss Adams' analysis likely substantially understates EVEP's value for a number of reasons.  First, Moss Adams lacked information sufficient to estimate a value for EVEP's non-producing assets, such as those at Eagle Ford.   Second, EVEP's 2017 10-K indicates EVEP "own[s] and operate[s] a network of natural gas gathering systems in the Appalachian Basin and the Monroe field in Northern Louisiana which gather and transport owned natural gas and a small amount of third party natural gas to intrastate, interstate and local distribution pipelines." Moss Adams lacked information to value this asset; PWP ignored these assets in its analysis. Third, Moss Adams further lacked information to assign a value to EVEP's subsidiary EnerVest Monroe Gathering, Ltd.  Had Moss Adams been able to value any of these assets, their valuation would have been potentially materially higher.

64.    PWP's analysis also flies in the face of the market evidence.  Immediately before EVEP's March 13, 2018 announcement that it would file for bankruptcy, on March 8, 2018, EVEP' stock closed at $0.58 per unit.  Based on EVEP's 49,368,869 common units outstanding, that means, EVEP's units were worth roughly $28.6 million, NOT zero.  Since then there is no reason to believe the stock would have dropped if the bankruptcy filing was not announced. PWP's "analysis" if you can call it that, is highly suspect for this reason alone.

65.     At bottom, even the Debtors and other constituencies in the Case do not believe PWP's analysis is correct, because they have agreed to provide value to EVEP's unitholders in the form of 5% of the reorganized Company's equity (subject to dilution by a management incentive plan and warrants for existing unitholders) and 5-year warrants to acquire up to 8% of the equity in the reorganized Company.  Therefore, PWP's analysis is not reliable evidence of the fairness and equity of EVEP's proposed plan.

### C.     The Liquidation Analysis Omits Potential Recoveries from Avoidance Actions.

66.     The Debtors' Liquidation Analysis submitted with their Disclosure Statement improperly consolidates the estates and completely omits estate causes of action.  Indeed, the Liquidation Analysis specifically provides that it "does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions."  *See* Exhibit C to the Disclosure Statement, Liquidation Analysis, at p. 2.

67.     The recovery on such causes of action constitutes potentially valuable estate property that could be realized in a Chapter 7 liquidation and thereby provide a meaningful recovery to equity holders.  These potential causes of action might include breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, breach of the covenant of good faith and fair dealing, and fraudulent transfer actions.  To be sure, the 2015 transaction that resulted in a 25% or $70 million write down appears to be ripe for investigation.

68.     Rather than provide sufficient information concerning any potential Causes of Action, the Debtors made a blanket statement that holders of allowed Class 6 claims would not receive a recovery in a chapter 7 liquidation.  Disclosure Statement at p. 6 (Existing EVEP Equity Interests to receive 0% recovery under chapter 7 liquidation); *see also* Exhibit C to the

Disclosure Statement, Liquidation Analysis, at p. 7 ("Existing EVEP Equity Interests are projected to receive zero recovery.").

69.    The Plan merely provides that all Existing EVEP Equity Interests will be canceled, released, and extinguished and will be of no further force or effect as of the Effective Date, and holders of Existing EVEP Equity Interests will not receive any distribution on account of such Interests (although in direct contradiction of such conclusory statements they will receive a pro rata share of 5% of New Common Stock and the New Warrants).  *See* Disclosure Statement at p. 9.

70.    Such a representation clearly does not meet the Debtors' burden under section 1129(a)(7) of the Bankruptcy Code.  The Debtors must include an entity by entity analysis and include these Causes of Action in their liquidation analysis to show that the best interest test as it applies to the Existing EVEP Equity Holders has been satisfied.  *See In re Wash. Mutual, Inc.*, 442 B.R. 314, 359–60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").  They have failed to do so. For this reason, which is sufficient on its own, the Plan does not satisfy the best interest of creditors test and cannot be confirmed.

**D.    The Liquidation Analysis Is Based Upon Unreasonable Assumptions.**

71.    The assumptions underpinning the Liquidation Analysis are far off the mark and render it materially misleading, if not useless, and are admittedly used to reach a "conservative" valuation to the clear benefit of the Debtors.

72.    These flawed assumptions include those concerning the current conditions of the oil, natural gas, and NGLs market; the alleged need to sell assets individually rather than

together or grouped according to geographical location (despite the apparent boom in transactions in most of the relevant markets); and the use of $40 per barrel as the assumed price in the Liquidation Analysis despite the fact that prices per barrel are currently more than 50% higher.

73.     Because of these flawed, inaccurate assumptions, the analysis is materially misleading and the Court should accord the Liquidation Analysis no, or at best limited, evidentiary weight because it contains inappropriate assumptions unsupported by the evidence.[7]

74.     The use of book values as of December 31, 2017 in the Liquidation Analysis also renders it unacceptable inasmuch as the prices of oil, natural gas, and NGLs have increased over the course of the last five months and the near-term forward looking strips reflect current optimism of future prices.

75.     The Liquidation Analysis also assumes, without any support, that the Debtors' operating assets "would likely require an individual marketing and sale process that would last several months" and that the Debtors' "ability to pursue all such processes simultaneously is limited by its headcount."  This conclusory assumption fails to take into account that multiple assets could be bundled together – for example, by geographical location – and sold together rather than individually.  And, if this were to occur, the argument that the Debtors are limited in their ability to sell their assets due to lack of employees or management necessarily fails.  Furthermore, this assumption completely contradicts the fact that the same folks that could market the Debtors' assets marketed EnerVest's assets to TPG Pace in the $2.66 billion Magnolia transaction, the timing of which appears to have coincided with the preparation of these Cases.

---

[7]     The Objectors reserve their rights to file a motion to exclude portions of the Liquidation Analysis from evidence pursuant to Fed. R. Evid. 702.

76.    Further, the Liquidation Analysis discounts the value of the Debtors' assets because of their geographical breadth – again failing to consider that assets could be sold by location.

77.    Most significantly, the Liquidation Analysis inexplicably deems certain "Proved Developed Non-Producing" ("PDNP") and other Proved Undeveloped ("PUD") reserves as lacking *any* realizable value, ostensibly because of the cost to render those reserves productive, because there is no historical data to evaluate production value, and because these reserves are allegedly not perceived by the oil and gas Acquisition & Divestiture market "**to be as** marketable as the Eagle Ford assets" (emphasis added); not unmarketable.  The Debtors offer nothing in support of these conclusory statements, nor do they indicate how the relative marketability of these reserves vis-à-vis the Eagle Ford assets has any effect on the potential realizable value of such reserves.

**E.    The Plan Is Not Fair and Equitable as Required By 11 U.S.C. § 1129(b) Because It Gives the 8.00% Senior Noteholders More Than They Are Entitled to Receive.**

78.    The flawed PWP Valuation and Liquidation Analysis provides value to the Noteholders well in excess of their asserted claims.  This lopsided value transfer away from the public Existing EVEP Equity Holders violates the "fair and equitable rule" and, therefore, renders the Plan not confirmable under section 1129(b)(1) of the Bankruptcy Code.  As Plan proponents, it is the Debtors' burden to prove to this Court that the Plan complies with the requirements of the Code.  *See Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 (9th Cir. 1994) (plan proponent bears burdens of proof and persuasion regarding plan's compliance with Code).  Here, the Debtors cannot carry these burdens and, as a consequence, confirmation should be denied.

**II.    The Plan Should Not Be Confirmed Because It Incorporates Impermissible Release and Exculpation Provisions.**

79.    The Debtors bear the burden to prove that the Debtor Releases are appropriate under the Bankruptcy Code and applicable law in this Circuit.  *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) (proponent bears the burden of establishing propriety of proposed releases).  In the Third Circuit, releases of non-debtors are the exception rather than the rule.  *See In re Washington Mut., Inc.*, 442 B.R. 314, 351 (Bankr. D. Del. 2011).

80.    Sections VIII.C, D, and E of the Plan include the proposed Debtor Releases, Third Party Releases, and Exculpation respectively (collectively the "Releases").  These Releases are impermissible, because the Released Parties include—for no consideration—the Supporting Noteholders, the RBL Lenders, and the Debtors' current and former officers and directors, notwithstanding the potential existence of valuable estate claims against such parties, which an equity committee may have a right to investigate.  *See In re Washington Mut.*, 442 B.R. at 349 (rejecting the debtors' proposed release of certain settlement noteholders, ruling that the noteholders' self-interested participation in settlement negotiations with the debtors was an "insufficient contribution to warrant a release by the Debtors.").  Similarly, in this case, the Consenting Noteholders' self-interested participation in the RSA and Plan negotiation process, that potentially results in their receiving more value than the extent of their claims, certainly does not constitute a sufficient contribution to the Plan to warrant such a generous release.  *See id.*  To be clear, neither the Consenting Noteholders nor the RBL Lenders have provided consideration for their release under the Plan.

81.    In addition, the Third Party Release is impermissible because the definition of Releasing Parties would seek to bind Existing EVEP Equity Holders to a nonconsensual release of all claims unless each opts out, notwithstanding that equity holders do not get to vote to accept

or reject the Plan, nor did the Debtors provide an opt-out form.  The Release by Existing EVEP Equity Holders is inconspicuous and the opt-out right is simply hidden.  Such releases and injunctions are not permitted under applicable law and should be rejected by the Court.  *See In re Continental*, 203 F.3d 203 (3d Cir. 2003) (stating that non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in "extraordinary cases," requiring "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *see also In re Washington Mut.*, 442 B.R. at 354-55 (concluding that "third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the plan and not opting out of the third party releases"); *In re Zenith Elecs. Corp.,* 241 B.R. 92, 111 (Bankr. D. Del. 1999) (holding that third party release could not be accomplished without the affirmative agreement of the creditor providing the release).  Moreover, in the Third Circuit, failure to vote, Debtors' failure to conspicuously disclose the proposed Releases, and Debtors' failure to conspicuously disclosure opt-out rights and procedures, "is not a sufficient manifestation of consent to a third party release."  *See In re Washington Mut.*, 442 B.R. at 355.

82.    Therefore, the Releases clauses are not permitted under Third Circuit case law, and the Plan cannot be confirmed.

## III.    The Plan Was Not Proposed in Good Faith.

83.    The Plan is not confirmable, because the Debtors have not acted in good faith and did not propose the Plan in good faith.  Therefore the Plan violates section 1129(a)(3) of the Bankruptcy Code.  A plan is proposed in good faith within the meaning of section 1129(a)(3) if "there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Madison Hotel Associates*, 749 F.2d 410, 424-25 (7th Cir. 1984).

84.     Here, the Debtors disenfranchised Objectors and other Holders of public equities in Class 6, which according to the Debtors are deemed to reject the Plan, despite being entitled to receive a distribution of securities under the Plan.  Section 1126(g) provides:

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain *any property under the plan on account of such claims or interests*.

11 U.S.C. § 1126(g).  The Plan provides that Class 6 Existing EVEP Equity Holders are to receive "five percent of the common stock in reorganized EVEP, as well as warrants for an additional eight percent of the common stock."  Debtors' Letter Response [D.I. 93], at 5.  The common stock and warrants are securities "of the estate."  Therefore, Holders of Class 6 are receiving a distribution under the Plan and are entitled to vote.  *In re Armstrong*, 432 F.3d 507 (3d Cir. 2005) (stock warrants constitute value received under plan); *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).

85.     Furthermore, the facts alleged above, including the discrepancy between Debtors' public reporting of values as contrasted with the PWP inherently unreliable values used to support stripping value from the Existing EVEP Equity Holders, the failure of completeness of and disclosures respecting the PWP analyses, the failure to solicit all Noteholders and most significantly, the failure to disclose the Magnolia transaction, the exclusion of EVEP's assets therefrom and the details and impact of the Non-Compete, all together demonstrate a lack of good faith toward the Existing EVEP Equity Holders.  Accordingly, the Plan cannot be confirmed.

**IV.     The Disclosure Statement Lacks Adequate Information and Should Not Be Approved.**

86.     A bankruptcy court may approve a disclosure statement only if it provides "adequate information."    Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

87.     Disclosure is "of prime importance in the reorganization process." *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).   "Given the necessity for adequate information in the Disclosure Statement and the paramount position section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (S.D.N.Y. 1990). *See also In re Galerie Des Monnaies of Geneva*, 55 B.R. 253, 259 (S.D.N.Y. 1985) ("The preparing and filing of a disclosure statement is a most important step in the reorganization of a Chapter 11 debtor. . . [I]t is crucial that a debtor be absolutely truthful…").   "What constitutes 'adequate information' will be determined by the facts and circumstances of each case in the discretion of the bankruptcy court." *Id*. at 259.

88.     Taking into consideration the facts and circumstances of the instant case, including, without limitation, the deficiencies and discrepancies identified above, the Disclosure Statement does not provide adequate information for parties in interest to make an informed judgment about the Plan on at least nine (9) grounds:  (i) there is inadequate disclosure regarding the history of the Debtors and their assets and liabilities; (ii) there is inadequate disclosure regarding the Debtors' reasons for seeking chapter 11 relief; (iii) there is no disclosure regarding the Magnolia transaction, such as the consideration received by the Debtor in exchange for

entering into the Non-Compete agreement; (iv) there is no disclosure regarding the Causes of Action, including those to subordinate claims; (v) there is no disclosure regarding Avoidance Actions and the transfers in the applicable years before the Petition Date; (vi) there is inadequate disclosure regarding intercompany and insider transactions; (vii) there is inadequate disclosure regarding the JOA; (viii) there is inadequate disclosure regarding the MIP and other awards to be provided to Debtors' insiders; and (ix) there is no disclosure of the liquidation value of the EVEP estate.  Therefore, the Court should not approve the Disclosure Statement.

## RESERVATION OF RIGHTS

89.     The Objectors reserve all rights to receive production of documents and responses to outstanding discovery.  The Objectors further reserve all rights generally to supplement this Objection or to raise any objections, as supplement to this Objection with respect to any amendments to the Plan or Disclosure Statement and to make any technical or other comments with respect to any future plan or disclosure statement.  Additionally, the Objectors reserve the right to join in any other party's objections that are different from those asserted here at any hearing on the Plan or Disclosure Statement.

## OPT-OUT OF RELEASES

90.     The Objectors each opts out of the Releases.

## CONCLUSION

91.     For these reasons, and for those reasons that may be stated at a hearing on the approval of the Disclosure Statement and Plan confirmation, the Objectors request that this Court deny approval of the Disclosure Statement, deny confirmation of the Plan, and grant the Objectors other and further relief as is just and appropriate under the circumstances.

Respectfully submitted,

Dated:  May 8, 2018
       Wilmington, Delaware

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
Derrick B. Farrell (DE 5747)
Kaitlin MacKenzie Edelman (DE 5924)
Jason Daniel Angelo (DE 6009)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email: stuart.brown@dlapiper.com
      derrick.farrell@dlapiper.com
      kaitlin.edelman@dlapiper.com
      jason.angelo@dlapiper.com

-and-

Eric Goldberg (admitted *pro hac vice*)
David M. Riley (admitted *pro hac vice*)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Telephone:  (310) 595 3000
Facsimile:   (310) 595 3300
Email: eric.goldberg@dlapiper.com
      david.riley@dlapiper.com

*Counsel to Jerry Roger Kent, RK Investments, Inc.,*
*and Selma Poznanovich*